**THE TOSCANO LAW FIRM, LLC**
80 Bloomfield Ave.
Suite 101
Caldwell, NJ  07006
Phone: 973-226-l691
Facsimile:  973-226-l693
E-Mail:  ptoscano@pptlawfirm.com

Attorney for Plaintiff

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTONIO MANATA, Clark Police Lieutenant, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF NEWARK,  EVARISTO CORDERO, RUI PINTO and ROBBY RIOS, <br><br> Defendants. | **COMPLAINT** |

**INTRODUCTION**

1. This is an action for monetary damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, N.J.S.A. 10:6-2, as well as the common law of the State of New Jersey, against the City of Newark, Evaristo Cordero, Rui Pinto and Robby Rios, police officers of the City of Newark, in their professional and individual capacities.

## JURISDICTION AND VENUE OF THIS UNITED STATES DISTRICT COURT

2. This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§. 1331, 1343 (3) and (4), 42 U.S.C. §§ 1983 and 1988, as well as the Fourth Amendment to the United States Constitution dealing with freedom from unlawful search and seizures.

3. Venue is proper in this District pursuant to 28 U.S.C. 1391(b)(2) because the events/omissions giving rise to these causes of action all occurred in the District of New Jersey.

## PARTIES

4. Plaintiff, Antonio Manata, at all relevant times mentioned herein, is a Police Lieutenant with the Clark, Union County, New Jersey Police Department (hereinafter referred to as "plaintiff"), previously serving as a Newark, NJ Police Officer. He is an excellent law enforcement officer in his own right. His professional reputation among law enforcement is essentially impeccable. His work record is one of an assiduous, dedicated and decorated law enforcement officer, and is what every forthright and honest law enforcement officer emulates to be. Simply put, he is the quintessential law enforcement officer.

5. Defendant, City of Newark (hereinafter referred to as "City" or "Newark"), is a municipal corporation of the State of New Jersey located in Essex County. It is governed under the mayor-council-administrator form of government, controlling the day-to-day operations of the Newark Police Department (hereinafter referred to as "NPD") by way of hiring, training, retaining, teaching, disciplining, paying, monitoring and/or terminating its employees. Newark is also the public employer of the defendant Officers.

6. Defendant Officers were, at all times relevant to this Complaint, duly appointed and acting officers of the Police Department of the City of Newark, acting under color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the United States, State of New Jersey and/or the City of Newark.

## RELEVANT FACTUAL AVERMENTS

7. The below recited atrocity began on August 20, 2018. On that date the plaintiff, off shift from the Clark Police Department, was present on one of the investment properties he owned when he encountered an extremely intoxicated, belligerent, quarrelsome and confrontational male who the plaintiff did not recognize as a tenant thereof.

8. When the plaintiff politely asked that person (later identified as Charles Perkins "Perkins") to leave the premises, Perkins became wildly aggressive, agitated and antagonistic while walking away, threatening the plaintiff with physical harm over and over again. It was immediately obvious to the plaintiff, by virtue of his training and years of law enforcement experience, that there was something emotionally askew with Perkins.

9. It was then ascertained that Perkins was in fact a prior resident of the property who moved out, yet returned to the property routinely to hang out while constantly under the influence of alcohol and/or narcotics.

10. Immediately after walking away, Perkins returned, threatening to shoot the plaintiff. Because the plaintiff is a law enforcement officer, he met Perkins at the gate dividing the property from the public right of way, in order to assure the safety of other residents if Perkins attempted to make good on his threat.

11. When the plaintiff refused to allow Perkins access to the property, Perkins stated, without hesitation or equivocation, that he "was going to put a bullet" in the plaintiff's head, making clear gestures to his waistband.

12. The plaintiff then made it clear to Perkins that he was a law enforcement officer and, while Perkins was still present, the plaintiff proceeded to close/secure the gate to the property.

13. When Perkins stepped back, he literally and plainly fell over his own feet because of the exceedingly high level of his apparent intoxication, hit his face on the fence and then fell to the ground, hitting his face once again.

14. Immediately upon getting back to his feet, Perkins wrongly accused the plaintiff of punching him, which allegation was both absurd and outlandish. The plaintiff never touched him in any way, shape or form, nor came anywhere near his personal space.

15. Later on, NPD Officers showed up at the scene. The plaintiff was already inside the premises when they showed up, handling his routine and customary managerial duties. One of his tenants advised the plaintiff that the officers wanted to speak to him, so the plaintiff promptly advised the tenant to ask the officers to come inside (the plaintiff was counting certain rent monies at the time and did not want to leave the cash unattended). Within a short time, defendant NPD officers Pinto and Rios entered and walked toward the plaintiff, enigmatically with their hands on their firearms, which was wholly unnecessary and improper, not to mention odd.

16. The plaintiff immediately/appropriately advised Pinto and Rios that he was a Lieutenant with the Clark, NJ Police Department and, as a result, was carrying.

17. Pinto and Rios then advised the plaintiff that Perkins claimed that the plaintiff punched him. Astonished, the plaintiff forthwith showed the officers his hands, which did not have

4

any trace at all of blood or other evidence of any punch/assault as Perkins claimed. The plaintiff purposely did so because he realized that the officers were wearing body cameras, and could record as fact what he stated to the both of them. Both officers at that time agreed with the plaintiff that it did not appear as though he assaulted Perkins, but that two (2) purported "witnesses" supported Perkin's version.

18. The plaintiff punctually told Pinto and Rios that what the "witnesses" said could not have been true, and that there were two (2) other persons present who were much closer to the scene who could give statements about the real truth/veracity of what occurred.

19. Both Pinto and Rios thereafter advised the plaintiff that the witnesses who were closer did in fact flatly state to them that Perkins fell on his own, and that the plaintiff did not assault him. Yet Pinto and Rios did not perform any of the necessary and routine follow up relative thereto, which was outrageous. Moreover, even though Pinto and Rios obtained the full names of those witnesses whose version of the events were fully supportive of the plaintiff's, those witnesses names were purposely omitted from their official police report.

20. Within minutes, NPD Sergeant Antonio Barbosa arrived at the location. The plaintiff showed Barbosa the lack of any injury at all to his hands, which Barbosa acknowledged. Barbosa then gave a direct and clear Order to both Pinto and Rios, in the presence of the plaintiff, to draft an incident report that conspicuously reflected both versions of the event in question, as well as the fact that there was no injury at all to the plaintiff's hands.

21. At that point, and while being attended to by EMS, Perkins was seen to irately jump out of the ambulance and continue his drunken tirade. Despite all of the above, Perkins was then inexplicably and curiously escorted to his "former room" on the property by Pinto and Rios to obtain certain property he claimed he left there.

22. At that time, it was discovered that Perkins broke into the residence (an act of burglary) earlier and destroyed furniture (an act of criminal mischief). When Perkins was asked to find the "left behind" items, he ferociously shattered a window (again, an act of criminal mischief) in the presence of Pinto and Rios. He then (again in the presence of Pinto and Rios) threatened to shoot and kill the plaintiff (a terroristic threat). Quizzically, neither Pinto nor Rios arrested Perkins, charged Perkins or took any other appropriate action, even though they saw and heard everything Perkins did and said and were under a strict legal obligation to arrest and charge him criminally. Their malfeasance/misfeasance was unfathomable.

23. This is where the entire ordeal became, for want of a better word, even more surreal. When the plaintiff told Pinto and Rios that he would like to press charges against Perkins, as Pinto and Rios were sorely neglecting their duty in not doing so on their own accord, they both actually allowed Perkins to damage more of the plaintiff's property, which was eerie. And, after the officers allowed Perkins to walk away unscathed, defendant Rios point blank advised the plaintiff that one of Perkin's "witnesses" totally recanted what she told them initially – she told them that she did not see any assault. The plaintiff then told Rios to please ensure that this fact was added in his report. At that point, everyone went their own way, and Perkins was allowed by Pinto and Rios to leave also.

24. Then, on August 21, 2018, the plaintiff received a telephone call from one of his tenants of the subject property, who told him that there were NPD officers present on the property walking around and taking pictures. When asked by the plaintiff to put a detective on the phone, a female officer got on the phone and advised the plaintiff that she could not talk to him because he was a suspect in a crime she was investigating. To

put it bluntly, the plaintiff was exasperated. When that officer was asked if she had a search warrant (which she did not), she stated "no fucking cooperation, even from a cop".

25. As a result of (and what can only accurately be described as) the above recited craziness, the plaintiff decided to obtain a copy of the police report to ensure that same truthfully recited the relevant goings on. When he did so, much to his chagrin, the report was missing numerous highly relevant facts, as well as containing wholly inaccurate and mistaken information about what had transpired on the day in question.

26. The plaintiff's bad dream now became increasingly more incredulous to the plaintiff and, accordingly, the plaintiff proceeded, in earnest, to ascertain what was truly going on. And that is when the situation worsened.

27. Upon further inquiry by the plaintiff, he was told that when Pinto and Rios asked about including both/two (2) versions of the event in any report, they were explicitly ordered by their NPD supervisor, defendant Cordero, not to include the plaintiff's version (the true version). All three defendant officers, in concert and with conspiratorial intent, thereafter purposely and intentionally decided to omit the plaintiff's version of the events in the official report, which was a blatant act of Official Misconduct on their part, NJSA 2C: 30-2, a crime of the second (2) degree.

28. Moreover, the plaintiff ascertained that defendant Cordero made a remark to Pinto and Rios that the reason he gave the Order not to include the plaintiff's version in the official report was because Cordero had some sort of "personal", unrealted problem with the plaintiff. The entire situation was now out of control, and the plaintiff's federal, state and constitutional rights continued to be trampled on. Neither Pinto nor Rios ever reported Cordero's illegal conduct to their superiors at the NPD.

29. With no other alternative left, the plaintiff appeared at the NPD on August 22, 2018 to file an internal affairs complaint, which he did.

30. Thereafter, the plaintiff appeared at the NPD to report an unrelated theft of rent money by one of his employees. Cordero refused to even take that report. Subsequently, however, on August 23, 2018, the plaintiff received a telephone call from NPD Sergeant Ricca, wherein Ricca advised him the Cordero was wrong in not taking his report and wherein Ricca helped the plaintiff file same by traveling to Clark to take the report in order to undo Cordero's wrongdoing. It was clear to the plaintiff that for reasons wholly unknown to him, Cordero had some sort of irrational problem with him.

31. The fiasco and torment continued. On August 24, 2018, the plaintiff was present on his rental property. NPD Detective Rasheed Brown appeared and expressed to the plaintiff that he was present to take a statement from a witness to the above incident, then needed to talk to the plaintiff. When he spoke to the plaintiff, he made it evident that he realized that the plaintiff was a victim. When the plaintiff inquired as to why he (Brown) was now involved, Brown told him that the investigation was transferred to his Precinct because no one from the other Precinct wanted to be involved any further. As the plaintiff was advised by Brown that he was a victim (not a defendant), the plaintiff readily waived his fifth (5) amendment right and gave a voluntary statement to him.

32. On August 27, 2018, the plaintiff received a telephone call from NPD Captain Robert Kowolski. Kowolski agreed with the plaintiff that highly vital information was omitted from the official incident report which led to his follow up.

33. This marathon was unrelenting. On August 28, 2018, the plaintiff received a telephone call from NPD Sergeant Danny Costa, who advised the plaintiff that after internal review of the entire incident, he was told that the plaintiff "should be charged with assault" so it

"did not look like he was being favored because he is a cop – let the court throw it out". Simply put, this was abject foolishness and in direct violation of numerous of the plaintiff's federal and state rights.

34. The plaintiff's torment continued. On September 1, 2018, the plaintiff began to receive myriad letters from attorneys he did not know, soliciting the plaintiff's business in representing him in criminal court. The plaintiff was infuriated, as he was unaware of what they all meant, as he was never served with any criminal complaint. There was a criminal complaint number listed in one of the solicitations, so the plaintiff began his own investigation into what was happening.

35. The plaintiff at that point found out that a criminal complaint was filed against him by Detective Natasha Green, who was not involved in the incident or investigation and knew nothing about it (Exhibit A), yet was never served upon him, which was illegal in and of itself, because a "box" therein on a related return of service form was checked off as "unable to serve him" with said complaint (Exhibit B).  This of course was both incredible and unfounded, not to mention a blatant lie, as the NPD had all necessary information as to how to contact the plaintiff in a matter of mere seconds.

36. It was now more evident than ever that someone within the NPD was unlawfully, calculatedly, purposely, consciously, improperly and deliberately trying to ruin/derail the plaintiff's career. It was and remains common knowledge that if the plaintiff did not show for his initial court appearance (which he would not have because he purposely was not served with the complaint), a bench warrant would be issued for his arrest, and he would be picked up and incarcerated until he was brought before the issuing judge. The embarrassment that could have caused him as a two decade long law enforcement officer was inestimable.

37. On/about October 16, 2018, the plaintiff was advised in writing that his internal affairs complaint he signed against defendants Pinto and Rios was sustained in its entirety, and that the officers were punished accordingly (Exhibit C). However, for unknown reasons, defendant Cordero was apparently not disciplined at all.

38. The plaintiff was then constrained to hire highly experienced and well-known criminal defense counsel, at great financial cost, who appeared in court with his several times, each and every time the complaining officers not appearing.

39. To make matters worse, despite numerous discovery requests being properly made by his defense counsel for months, no discover whatsoever was forthcoming from the NPD. Upon information and belief, the video and audio statements taken were purposely held back/not provided and/or destroyed/spoliated by someone at the NPD.

40. During the month of December, 2018, a bench warrant was wrongfully issued for the plaintiff's arrest and, not until after the plaintiff's defense counsel spent countless hours upon hours dealing with the issue, was that inappropriately issued bench warrant recalled.

41. On January 4, 2018, the plaintiff appeared in court (after appearing in court numerous times prior) to stand trial on the above mentioned absurd, bogus and false charge of assault. No one from the NPD showed up in court, and the matter was finally dismissed by the trial judge, with prejudice.

42. Perhaps the most scandalous, outrageous and deplorable atrocity in this entire tale/anecdote then transpired. The plaintiff was subsequently advised by people that he knew that both Pinto and Rios previously/recently gave sworn and video-taped statements to internal affairs wherein they both admitted that the reason they purposely omitted the plaintiff's version of the events on the day in question from the official

incident report was because defendant Cordero ordered/instructed them to do so, as he (Cordero) "had a personal issue" with the plaintiff.

43. On April 3, 2018, the plaintiff served the City of Newark with the requisite Title 59 Notice of Tort Claim as a direct result of the egregious/illegal/deliberately indifferent/intentional conduct of its involved employees and Newark's abject failure to monitor/control all that it should have.

## SPECIFIC CAUSES OF ACTION

### COUNT ONE

### (42 USC 1983)

44. Plaintiff incorporates Paragraphs 1 through 43 as if fully recited herein.

45. In violation of 42 U.S.C. 1983, all defendants, while acting under color of law, violated the plaintiff's Fourth Amendment rights to be free from unlawful/illegal search and seizures of his person, and deprived the plaintiff of his right to enjoy this Constitutional protection.

46. Moreover, all defendants illegally brought these false criminal charges against the plaintiff, in direct violation of United States Constitution, Article 14. This malicious abuse of process/malicious prosecution was evident, inexcusable and unpardonable. At no time did any of the defendant officers intervene and take the appropriate action herein, even though one or any of them could and should have at any given time.

## COUNT TWO

### (CIVIL CONSPIRACY TO VIOLATE THE PLAINTIFF'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS)

47. Plaintiff repeats the allegations set forth in all preceding paragraphs.

48. All defendants, by and through their employees, officials and perhaps other as of yet unidentified individuals, agreed in concert with one another to commit unlawful acts against plaintiff, and/or to commit facially lawful acts by unlawful means, as hereinabove described.

49. Pursuant to and in furtherance of said agreement and combination, all defendants committed overt acts which acts include those hereinabove stated.

50. Moreover, all individual defendants entered into an unlawful agreement and/or understanding to perpetuate one or more tortious acts upon the plaintiff.

51. As the direct and proximate result of the defendants' vicious conspiracy, the plaintiff has been and will continue to be severely damaged.

## COUNT THREE

### (MALICIOUS PROSECUTION/ABUSE OF PROCESS)

52. Plaintiff repeats the allegations set forth in all preceding paragraphs.

53. The defendants maliciously filed the above criminal complaint without probable cause or without a reasonable ground of suspicion supported by circumstances sufficient to warrant an ordinary prudent law enforcement officer in believing that the plaintiff committed any criminal offense whatsoever. Moreover, no discovery was ever, at any time, provided to the plaintiff in order to allow him to defend himself against the above mentioned bogus/false/trumped up criminal charge.

54. Plaintiff Manata suffered gravely, on numerous different levels, caused by the wrongful institution of the false criminal claim.

## COUNT FOUR

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

55. Plaintiff repeats the allegations set forth in all preceding paragraphs.

56. As described above, in committing the acts and omissions to act complained of, the defendant NPD officers acted intentionally and purposefully to cause the plaintiff emotional distress and injury, and/or acted in reckless disregard for a high degree of probability that emotional distress would follow from their conduct.

57. Defendants' continuous and relentless conduct was extreme and outrageous and was so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

58. As the direct and proximate cause of the defendant NPD officers' extreme and outrageous intentional and/or reckless conduct, the plaintiff suffered genuine and substantial emotional distress and injury.

59. The defendant NPD officers conduct was so severe and extreme as to cause genuine and substantial emotional distress or mental harm to the average person similarly situated to the plaintiff, and plaintiff suffered such severe and substantial emotional distress and mental injury that no reasonable person would be expected to endure.

## COUNT FIVE

### (INVASION OF PRIVACY)

60. Plaintiff repeats the allegations set forth in all preceding paragraphs.

61. All defendant NPD officers invaded the plaintiff's privacy by acting in the fashion above, said invasion resulting from the intrusion upon the plaintiff's seclusion and privacy concerns, which was highly offensive to the plaintiff/a reasonable person in plaintiff's position.

## COUNT SIX

### (42 U.S.C. § 1983 AGAINST THE CITY OF NEWARK)

62. Plaintiff repeats the allegations set forth in all preceding paragraphs.

63. Prior to the above mentioned dates, the City of Newark developed, cemented, engrained and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in Newark, which eventually caused the egregious violations of the plaintiff's rights.

64. Additionally, the City of Newark failed to use reasonable care in the selection of its NPD officers, failed to properly train and/or supervise them and failed to prevent the false/improper arrest, conspiracy and/or collective violations of the plaintiff's rights.

65. Further, Newark, under color of state law, directly or indirectly approved or ratified the unlawful, malicious and wanton conduct of the defendant officers herein.

66. Moreover, Newark failed to train the defendant officers to issue truthful investigative reports and corresponding charges.

67. Unequivocally, Newark knew or should have known that the defendant officers would have to make daily decisions regarding the legality/concept of probable cause.

68. Indeed, the lack of training of the defendant officers led to these officers violating the plaintiff's constitutional rights egregiously regarding/concerning his right to be free from unlawful arrest and/or prosecution.

69. Notwithstanding the above, Newark's policy maker refused to retain or properly train its officers in how to properly investigate and charge persons with violations of the criminal laws.

70. The lack of training and/or the inadequate training in these areas is surely tantamount to a custom and/or policy that encourages and, indeed as occurred herein, necessitates the violation of these human rights.

71. Newark's blatant and deliberate indifference herein led to the inescapable fact that if it trained its officers properly, then the within abhorrent and illegal police actions would never have taken place.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38, the plaintiff herein demands a trial by jury on all counts.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays that this honorable United States District Court:

(a)  accept jurisdiction over this matter;

(b)  empanel a jury to hear and decide this matter;

(c)  award against defendants compensatory and punitive damages in a manner determined by a jury;

(d)  placing the NPD into Receivership for the purpose of instituting programs to train, instruct, discipline, control and supervise the officers of the NPD;

(e)  award to plaintiff the reasonable statutory attorneys' fees, interest and costs of this litigation; and

(f)  for such/any other relief that this Court deems equitable and just.

Dated: April 9, 2019                By:  *s/ Patrick P. Toscano, Jr.*
                                          Patrick P. Toscano, Jr. (9415)

15